**JR TECHNOLOGY HOLDINGS, LLC**

**MANAGEMENT INCENTIVE UNIT AGREEMENT**

**THIS MANAGEMENT INCENTIVE UNIT AGREEMENT** (this "Agreement") is made this 21st day of May 2015 (the "Grant Date") by and between JR Technology Holdings, LLC, a Delaware limited liability company (the "Company") and Vince Lowell ("Executive"). Capitalized terms used but not otherwise defined herein shall have the meaning assigned to such terms in the LLC Agreement (as defined in Section 18 hereof).

**NOW, THEREFORE,** in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1. Issuance of Units.

(a) Issuance. Upon execution of this Agreement, the Company will issue to Executive, and Executive will accept from the Company, 333.50 Management Incentive Units, without any consideration paid, or any other Capital Contribution made or deemed made, by or on behalf of Executive in respect thereof, subject to the provisions of the LLC Agreement. The Units granted hereunder (and any units of equity or other capital interests issued with respect to such Units, including by way of any split, combination, distribution or other recapitalization of such Units) are referred to herein as the "Executive Units." The Executive Units are intended to constitute Management Incentive Units for purposes of the LLC Agreement, and Executive will be treated as a Management Incentive Holder for purposes of the LLC Agreement with respect to the Executive Units. The Participation Threshold of the Executive Units as of the date hereof is one thousand dollars ($1,000) per Unit and may be adjusted from time to time as provided in Section 1(h) hereof and the LLC Agreement.

(b) Company Reliance. By execution hereof, Executive acknowledges that the Company is relying upon the accuracy and completeness of the representations and warranties contained herein in complying with the Company's obligations under applicable securities laws.

(c) Tax Election. Executive shall make an effective election with the United States Internal Revenue Service under Section 83(b) of the Code in the form of Exhibit A attached hereto and shall deliver herewith the executed Section 83(b) election to the Company for filing with the United States Internal Revenue Service.

(d) No Certificates. The Executive Units shall be uncertificated unless otherwise determined by the Company.

(e) Executive's Representations and Warranties. In connection with the grant of the Executive Units hereunder, Executive hereby represents and warrants to the Company that:

(i) Executive is acquiring the Executive Units to be acquired by Executive hereunder for Executive's own account with the present intention of holding such securities for investment purposes and that Executive has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state or foreign securities

laws. Executive acknowledges that the Executive Units have not been registered under the Securities Act or applicable state or foreign securities laws and that the Executive Units will be issued to Executive in reliance on exemptions from the registration requirements of the Securities Act and applicable state and foreign statutes and in reliance on Executive's representations and agreements contained herein.

(ii) The execution, delivery and performance by Executive of this Agreement and the consummation of the transactions contemplated hereby do not and will not (with or without the giving of notice, the lapse of time, or both) result in a violation or breach of, conflict with, cause increased liability or fees, or require approval, consent or authorization under (A) any law, rule or regulation applicable to Executive, or (B) any contract to which Executive is a party or by which Executive or any of Executive's properties or assets may be bound or affected.

(iii) Executive is an employee of the Company and/or one of its Subsidiaries.

(iv) Executive has had an opportunity to ask the Company and its representatives questions and receive answers thereto concerning the terms and conditions of the Executive Units to be acquired by Executive hereunder and has had full access to such other information concerning the Company and its Subsidiaries as Executive may have requested in making Executive's decision to invest in the Executive Units being issued hereunder.

(v) Executive acknowledges that the Executive Units are subject to the restrictions contained in the LLC Agreement, and Executive has received and reviewed a copy of the LLC Agreement.

(vi) Executive will not sell or otherwise transfer, assign, convey, exchange, mortgage, pledge, grant or hypothecate any Executive Units without registration under the Securities Act (and any applicable federal, state and foreign securities laws) or an exemption therefrom, and provided there exists such a registration or exemption, any such transfer of Executive Units by Executive or subsequent holders of Executive Units will be in compliance with the provisions of this Agreement and the LLC Agreement.

(vii) Executive has all requisite legal capacity and authority to carry out the transactions contemplated by this Agreement and the LLC Agreement, and the execution, delivery and performance by Executive of this Agreement and the LLC Agreement and all other agreements contemplated hereby and thereby to which Executive is a party have been duly authorized by Executive.

(viii) Executive has only relied on the advice of, or has consulted with, Executive's own legal, financial and tax advisors, and the determination of Executive to acquire the Executive Units pursuant to this Agreement has been made by Executive independent of any statements or opinions as to the advisability of such acquisition or as to the properties, business, prospects or condition (financial or otherwise) of the Company or any of its Subsidiaries which may have been made or given by any other Person (including all Persons acquiring Units on the date hereof) or by any agent or employee of such Person and independent of the fact that any other Person has decided to become a holder of Units.

(ix) Executive is not acquiring the Executive Units as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine, internet publication or similar media or broadcast over television, radio or the internet or presented at any public seminar or meeting, or any solicitation of a subscription by a Person not previously known to Executive in connection with investments in securities generally.

(x) Executive was not induced to enter into this Agreement by expectation of employment or continued employment with the Company or any of its Subsidiaries.

(f) Additional Acknowledgements. As an inducement to the Company to issue the Executive Units to Executive and as a condition thereto, Executive hereby acknowledges and agrees that:

(i) neither the issuance of the Executive Units to Executive nor any provision contained in this Agreement or the LLC Agreement shall entitle Executive to remain in the employment of the Company or any of its Subsidiaries or affect the right of the Company or any of its Subsidiaries to terminate Executive's employment at any time; and

(ii) except as expressly set forth in the LLC Agreement or as required by applicable law, the Company shall have no duty or obligation to disclose to Executive, and Executive shall have no right to be advised of, any material information regarding the Company or any of its Subsidiaries at any time prior to, upon or in connection with the repurchase of Executive Units upon the termination of Executive's employment with the Company and/or any of its Subsidiaries or as otherwise provided hereunder.

(g) Compensatory Arrangements. The Company and Executive hereby acknowledge and agree that this Agreement has been executed and delivered, and the Executive Units have been issued hereunder, in connection with and as a part of the compensation and incentive arrangements between the Company and the applicable Subsidiaries, on the one hand, and Executive, on the other hand. Each of the Executive Units granted hereunder is intended to qualify for an exemption from the registration requirements under the Securities Act, and under similar exemptions under applicable state securities laws. In the event that any provision of this Agreement would cause the Executive Units granted hereunder not to qualify for an applicable exemption from registration under the Securities Act, Executive and the Company agree that this Agreement shall be deemed automatically amended to the extent necessary to cause the Executive Units to qualify for such an exemption.

(h) Adjustments. If there shall occur any change with respect to the outstanding Units by reason of any recapitalization, reclassification, stock split, reverse stock split or any merger, reorganization, consolidation, combination, spin-off or other similar corporate change affecting the Units, the Board of Directors of the Company (the "Board") shall, in the manner and to the extent that it deems appropriate and equitable in its discretion, cause an adjustment to be made in the number of Executive Units granted hereunder, the Participation Threshold and any other terms hereunder that are affected by the event to prevent dilution or enlargement of Executive's rights hereunder.

2. Vesting of Units.

(a) Time Vesting Units. Fifty percent (50%) of the Executive Units (the "Time Vesting Units") shall become vested as follows; provided Executive is then employed by or performing services for the Company or any of its Subsidiaries.

| **Vesting Date** | **Vested Percentage of Time Vesting Units** |
|---|---|
| March 17, 2016 | 20% |
| March 17, 2017 | 40% |
| March 17, 2018 | 60% |
| March 17, 2019 | 80% |
| March 17, 2020 | 100% |

There shall be no proportionate or partial vesting in the periods prior to each vesting date set forth above and all vesting shall occur only on the appropriate vesting date, subject to Executive's continued service with the Company or any of its Subsidiaries on each applicable vesting date.

(b) Performance Vesting Units. Fifty percent (50%) of the Executive Units (the "Performance Vesting Units") shall become vested as provided in this Section 2(b). There shall be no pro rata vesting or straight line interpolation for performance between the hurdles below, and all vesting will occur only on a "cliff" basis at the applicable performance level.

(i) 12.5% Internal Rate of Return. One-third of the Performance Vesting Units shall become vested upon the occurrence of an Exit Event if the Crestview Group has achieved an Internal Rate of Return as of the applicable Exit Event (including any prior Exit Event on a cumulative basis) of at least twelve and one-half percent (12.5%); provided that Executive remains in the continued service of the Company or any of its Subsidiaries through the applicable Exit Event.

(ii) 15% Internal Rate of Return. An additional one-third of the Performance Vesting Units shall become vested upon the occurrence of an Exit Event if the Crestview Group has achieved an Internal Rate of Return as of the applicable Exit Event (including any prior Exit Event on a cumulative basis) of at least fifteen percent (15%); provided that Executive remains in the continued service of the Company or any of its Subsidiaries through the applicable Exit Event.

(iii) 17.5% Internal Rate of Return. The remaining one-third of the Performance Vesting Units shall become vested upon the occurrence of an Exit Event if the Crestview Group has achieved an Internal Rate of Return as of the applicable Exit Event (including any prior Exit Event on a cumulative basis) of at least seventeen and one-half percent (17.5%); provided that Executive remains in the continued service of the Company or any of its Subsidiaries through the applicable Exit Event.

(iv) Certain Qualifying Terminations. Notwithstanding the provisions of Sections 2(b)(i), 2(b)(ii), and 2(b)(iii) hereof, in the event of Executive's termination of service by the Company or any of its Subsidiaries without Cause, the unvested portion of the Performance Vesting Units shall remain outstanding for a period of twelve (12) months following the date of such termination and may become vested during such twelve (12)-month period to the extent that an Exit Event occurs during such period and the applicable performance goals are achieved. Upon the expiration of such twelve (12)-month period or, if earlier, the Wind-Up Date, any remaining unvested portion of the Performance Vesting Units shall be automatically forfeited and cancelled without any consideration being paid therefor and otherwise without any further action of the Company whatsoever.

(c) Approved Sale; Discretion to Accelerate Vesting. Upon the consummation of an Approved Sale, all of the unvested Time Vesting Units shall immediately vest if Executive is then employed by the Company or any of its Subsidiaries. In addition, the Board may, in its sole discretion, vest any and/or all of the unvested Executive Units hereunder at such time or such other time or times and on such other conditions as the Board determines.

(d) Board Determinations. The Board shall in good faith make all determinations necessary or appropriate to determine whether the Performance Vesting Units have vested. All computations shall be made on a pro forma basis taking into account the vesting and payment of any entitlements under outstanding incentive equity awards of the Company, such that, if the foregoing performance goals are achieved, but, after the vesting and payment of any entitlements under outstanding incentive equity awards of the Company resulting from such achievement, such performance goals would no longer be achieved, then such vesting shall not take effect. The Board's determinations shall be final, binding and conclusive upon all Persons, absent bad faith or manifest error.

(e) Forfeitures. Except as otherwise expressly provided in this Section 2, all vesting of the Executive Units shall cease immediately upon termination of Executive's employment with the Company and its Subsidiaries for any reason, and all unvested Executive Units shall be automatically forfeited and cancelled upon any such termination without any consideration being paid therefor and otherwise without any further action of the Company whatsoever. Subject to earlier termination and forfeiture as provided herein and in the LLC Agreement, to the extent that any portion of the Executive Units do not become vested in accordance with the provisions of this Section 2, such unvested Executive Units shall be automatically forfeited and terminated as of the Wind-Up Date without any consideration being paid therefor and otherwise without any further action of the Company whatsoever.

(f) Termination of Service. For the purposes of this Agreement, the date of termination shall be Executive's last day of actual and active service. For the avoidance of doubt, no period of notice, if any, or payment in lieu of notice that is given or that ought to have been given under any applicable law or contract in respect of such termination of service that follows or is in respect of a period after Executive's last day of actual and active service shall be considered as extending Executive's period of service for the purposes of determining Executive's entitlement under this Agreement.

3. Restrictions Generally. The Executive Units are subject to the provisions of the LLC Agreement, which agreement provides, among other things, certain Company repurchase rights, restrictions on transfer and certain drag-along provisions with respect to the Executive Units.

4. Joinder to the LLC Agreement. The Company and Executive each acknowledges and agrees that Executive shall be entitled to the applicable benefits, and shall be subject to the applicable obligations, under the LLC Agreement. The acceptance of Executive Units hereunder shall constitute agreement by the Executive to be bound by all of the terms and conditions of the LLC Agreement, including with respect to the Executive Units. In furtherance thereof, upon the acceptance of Executive Units the Executive shall be required to execute and return to the Company the joinder to the LLC Agreement attached hereto as Exhibit C, unless the Executive is already a party to the LLC Agreement at such time. The LLC Agreement is incorporated herein by reference. In the event that Executive fails to timely comply with any of Executive's obligations under the LLC Agreement as determined by the Board in its good-faith discretion, Executive may be required to immediately forfeit any or all of the Executive Units outstanding at the time of such non-compliance without any consideration being paid therefor.

5. Restrictive Covenants.

(a) <u>Confidentiality</u>. During the course of Executive's employment with the Company or any of its Subsidiaries, Executive will have access to Confidential Information. For purposes of this Agreement, "<u>Confidential Information</u>" means all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Company or any of its Affiliates, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, customers, suppliers, vendors and/or competitors. Executive agrees that Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any Person, other than in the course of Executive's assigned duties and for the benefit of the Company, either during the period of Executive's employment or at any time thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty on the Company's and its Affiliates' part to maintain the confidentiality of such information, and to use such information only for certain limited purposes, in each case, which shall have been obtained by Executive during the Executive's employment by the Company and any of its Subsidiaries (or any predecessors). The foregoing shall not apply to information that (i) was known to the public prior to its disclosure to Executive; (ii) becomes generally known to the public subsequent to disclosure to Executive through no wrongful act of Executive or any representative of Executive; or (iii) Executive is required to disclose by applicable law, regulation or legal process (<u>provided</u> that Executive provides the Company with prior notice of the contemplated disclosure and cooperates with the Company at its expense in seeking a protective order or other appropriate protection of such information). The terms and conditions of this Agreement shall remain strictly confidential, and Executive hereby agrees not to disclose the terms and conditions hereof to any Person or entity, other than immediate family

members, legal advisors or personal tax or financial advisors, or prospective future employers solely for the purpose of disclosing the limitations on Executive's conduct imposed by the provisions of this Section 5 who, in each case, agree to keep such information confidential.

(b) Non-Competition. Executive acknowledges that (i) Executive performs services of a unique nature for the Company and its Affiliates that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the Company, (ii) Executive has had and will continue to have access to Confidential Information which, if disclosed, would unfairly and inappropriately assist in competition against the Company or any of its Affiliates, (iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such Confidential Information, (iv) the Company and its Affiliates have substantial relationships with their customers and Executive has had and will continue to have access to these customers, (v) Executive has received and will receive specialized training from the Company and its Affiliates, and (vi) Executive has generated and will continue to generate goodwill for the Company and its Affiliates in the course of Executive's employment. Accordingly, during Executive employment with the Company or any of its Subsidiaries and for a period of twelve (12) months thereafter, Executive agrees that Executive will not, directly or indirectly, own, manage, operate, control, be employed by (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) or render services to any Person, firm, corporation or other entity, in whatever form, engaged in competition with the Company or any of its Subsidiaries or in any other material business in which the Company or any of its Subsidiaries is engaged on the date of termination or in which they have planned, on or prior to such date, to be engaged in on or after such date, in any locale of any country in which the Company or any of its Subsidiaries conducts business. Notwithstanding the foregoing, nothing herein shall prohibit Executive from being a passive owner of not more than one percent (1%) of the equity securities of a publicly traded corporation engaged in a business that is in competition with the Company or any of its Subsidiaries, so long as Executive has no active participation in the business of such corporation.

(c) Non-Solicitation; Non-Interference. During Executive's employment with the Company or any of its Subsidiaries and for a period of twelve (12) months thereafter, Executive agrees that Executive shall not, except in the furtherance of Executive's duties to the Company or any of its Subsidiaries, directly or indirectly, individually or on behalf of any other Person, firm, corporation or other entity, (i) solicit, aid or induce any customer of the Company or any of its Subsidiaries to purchase goods or services then sold by the Company or any of its Subsidiaries from another Person, firm, corporation or other entity or assist or aid any other Person or entity in identifying or soliciting any such customer, (ii) solicit, aid or induce any employee, representative or agent of the Company or any of its Subsidiaries to leave such employment or retention or to accept employment with or render services to or with any other Person, firm, corporation or other entity unaffiliated with the Company or hire or retain any such employee, representative or agent, or take any action to materially assist or aid any other Person, firm, corporation or other entity in identifying, hiring or soliciting any such employee, representative or agent, or (iii) interfere, or aid or induce any other Person or entity in interfering, with the relationship between the Company or any of its Subsidiaries and any of their respective vendors, joint venturers or licensors. An employee, representative or agent shall be deemed covered by this Section 5(c) while so employed or retained and for a period of six (6) months thereafter. Notwithstanding the foregoing, the

provisions of this Section 5(c) shall not be violated by general advertising or solicitation not specifically targeted at Company-related Persons or entities.

(d) Inventions.

(i) Executive acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, methods, works of authorship and other work product, whether patentable or unpatentable, (A) that are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any Company resources and/or within the scope of Executive's work with the Company or any of its Subsidiaries or that relate to the business, operations or actual or demonstrably anticipated research or development of the Company or any of its Subsidiaries, and that are made or conceived by Executive, solely or jointly with others, during the period of Executive's employment with the Company or any of its Subsidiaries, or (B) suggested by any work that Executive performs in connection with the Company or any of its Subsidiaries, either while performing Executive's duties with the Company or any of its Subsidiaries or on Executive's own time, but only insofar as the Inventions are related to Executive's work as an employee or other service provider to the Company or any of its Subsidiaries, shall belong exclusively to the Company and the applicable Subsidiaries (or their designees), whether or not patent or other applications for intellectual property protection are filed thereon (the "Inventions"). Executive will keep full and complete written records (the "Records"), in the manner prescribed by the Company and the applicable Subsidiaries, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Company and the applicable Subsidiaries. The Records shall be the sole and exclusive property of the Company and the applicable Subsidiaries, and Executive will surrender them upon the termination of Executive's employment with the Company and the applicable Subsidiaries, or upon request. Executive will assign to the Company and the applicable Subsidiaries the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the period of Executive's employment with the Company and the applicable Subsidiaries, together with the right to file, in Executive's name or in the name of the Company and the applicable Subsidiaries (or their designees), applications for patents and equivalent rights (the "Applications"). Executive will, at any time during and subsequent to the period of Executive's employment with the Company and the applicable Subsidiaries, make such applications, sign such papers, take all rightful oaths, and perform all other acts as may be reasonably requested from time to time by the Company and the applicable Subsidiaries to perfect, record, enforce, protect, patent or register the Company's and the applicable Subsidiaries' rights in the Inventions, all without additional compensation to Executive from the Company, but entirely at the Company's expense. Executive will also execute assignments to the Company and the applicable Subsidiaries (or their designees) of the Applications, and give the Company and the applicable Subsidiaries and their attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Company's and the applicable Subsidiaries' benefit, all without additional compensation to the Executive, but entirely at the Company's and the applicable Subsidiaries' expense.

(ii) In addition, the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Company and the applicable Subsidiaries and Executive agrees that the Company and the applicable Subsidiaries will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or

hereinafter devised, throughout the universe and in perpetuity without any further obligations to Executive. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Company and the applicable Subsidiaries, Executive hereby irrevocably conveys, transfers and assigns to the Company and the applicable Subsidiaries, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of Executive's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, Executive hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that Executive has any rights in the Inventions that cannot be assigned in the manner described herein, Executive agrees to unconditionally waive the enforcement of such rights. Executive hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to Executive's benefit by virtue of Executive being an employee of or other service provider to the Company and the applicable Subsidiaries.

(e) Non-Disparagement. Executive agrees not to make negative comments or otherwise disparage the Company, the Subsidiaries or any of their respective officers, directors, employees, shareholders, members, agents or products other than in the good faith performance of Executive's duties to the Company and the Subsidiaries while Executive is employed by the Company and the Subsidiaries. The foregoing shall not be violated by truthful statements in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, depositions in connection with such proceedings).

(f) Reasonableness of Covenants. In signing this Agreement, Executive gives the Company assurance that Executive has carefully read and considered all of the terms and conditions of this Agreement and the LLC Agreement, including the restraints imposed under this Section 5. Executive agrees that these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates and their Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent Executive from obtaining other suitable employment during the period in which Executive is bound by the restraints. Executive acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Company and its Affiliates and that Executive has sufficient assets and skills to provide a livelihood while such covenants remain in force. Executive further covenants that Executive will not challenge the reasonableness or enforceability of any of the covenants set forth in this Section 5, and that Executive will reimburse the Company and its Affiliates for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this Section 5 if either the Company and/or its Affiliates prevails on any material issue involved in such dispute or if Executive challenges the reasonableness or enforceability of any of the provisions of this Section 5. It is also agreed that each of the Company's Affiliates will have the right to enforce all of Executive's obligations to that Affiliate

under this Agreement, including without limitation pursuant to this Section 5, and shall be third-party beneficiaries hereunder.

(g) Reformation. If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 5 is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state.

(h) Tolling. In the event of any violation of the provisions of this Section 5, Executive acknowledges and agrees that the post-termination restrictions contained in this Section 5 shall be extended by a period of time equal to the period of such violation, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation.

(i) Survival. The obligations contained in this Section 5 hereof shall survive the termination of Executive's employment with the Company or any of its Subsidiaries and the date on which Executive no longer holds, directly or indirectly, any equity in the Company, and shall be fully enforceable thereafter in accordance with the terms hereof.

(j) Remedies. Executive acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of this Section 5 would be inadequate and, in recognition of this fact, Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond or other security, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages. In the event of any material violation by Executive of this Section 5, any Executive Units outstanding at the time of such violation shall be immediately forfeited and cancelled as of the date of such violation without any consideration being paid therefor and otherwise without any further action of the Company whatsoever; provided that if such violation occurs after the Company has paid the repurchase price for the Executive Units under Section 3.1(d) of the LLC Agreement, then the Company shall be entitled to recover from Executive all such payments.

6. Entire Agreement; Amendments. This Agreement, together with the LLC Agreement, contain the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties hereto relating to such subject matter; provided that the restrictive covenants and other obligations contained in Section 5 are independent of, supplemental to and do not modify, supersede or restrict (and shall not be modified, superseded or restricted by) any non-competition, non-solicitation, confidentiality or other restrictive covenants in any other current or future agreement unless reference is made to the specific provisions hereof which are intended to be superseded. No modification, amendment or waiver of any provision of this Agreement shall be effective against the Company or Executive unless such modification, amendment or waiver is approved in writing by the Company and Executive; provided that the Company may modify, amend or waive any provision of this Agreement without the consent of Executive unless such amendment, modification or waiver would adversely affect the rights of Executive hereunder.

7. Notices. Any notice which may be required or permitted under this Agreement shall be in writing, and shall be delivered in person or via facsimile transmission, overnight courier service or certified mail, return receipt requested, postage prepaid, properly addressed as follows:

(a) If such notice is to the Company, to:

JR Technology Holdings, LLC
13365 Tyler Road
Holland, Michigan 49424
Attention: Michael T. DuBose
Fax: 616-399-6918

With copies (which shall not constitute notice) to:

Crestview Partners
667 Madison Avenue, 10th Floor
New York, New York 10065
Attention: Alex Rose
Fax: (212) 906-0789
Email: arose@crestview.com

and

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention: Alexander Fine
Facsimile: (212) 446-6460
Email: alexander.fine@kirkland.com

or at such other address as the Company, by notice to Executive, shall designate in writing from time to time.

(b) If such notice is to Executive, at Executive's address as shown on the Company's records, or at such other address as Executive, by notice to the Company, shall designate in writing from time to time.

8. Governing Law. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the laws of the State of Delaware shall control the interpretation and construction of this Agreement, even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

9. Jurisdiction; Waiver of Jury Trial. Any suit, action or proceeding with respect to this Agreement, or any judgment entered by any state or federal court in respect thereof, shall be brought in any state or federal court sitting in New York County in New York State, and each of the Company and Executive hereby submits to the exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment. Each of the Company and Executive hereby irrevocably waives any objections which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement brought in any such court, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in any inconvenient forum. Each of the Company and Executive hereby waives any right it may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this Agreement or any course of conduct, course of dealing, verbal or written statement or action of any party hereto.

10. Compliance with Laws. The issuance of the Executive Units pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any securities laws, rules and regulations applicable thereto of the United States (both federal and state laws) and any other applicable jurisdiction. The Company shall not be obligated to issue the Executive Units pursuant to this Agreement if any such issuance would violate any such laws, rules or regulations.

11. Binding Agreement; Assignment. This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns. Executive shall not assign or otherwise transfer any part of this Agreement without the prior written consent of the Company.

12. Rights of Executive. Nothing in this Agreement shall interfere with or limit in any way the right of the Company or any of the applicable Subsidiaries to terminate Executive's employment at any time (with or without Cause), nor confer upon Executive any right to continue in the employ of the Company or any of the applicable Subsidiaries for any period of time or to continue Executive's present (or any other) rate of compensation.

13. Acknowledgment of Executive. The award of the Executive Units does not entitle Executive to any benefit other than that granted under this Agreement. Any benefits granted under this Agreement are not part of Executive's ordinary salary and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

14. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

15. Further Assurances. Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement.

16. Severability. The provisions of this Agreement shall be deemed severable. The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it

being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by applicable law. Upon such determination that any provision, or the application of any such provision, is invalid, illegal, void or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the greatest extent possible. To the extent that the parties hereto cannot agree on a modification to this Agreement pursuant to the preceding sentence, it is the intention of the parties that the invalid, illegal, void or unenforceable provision of this Agreement may be modified or amended by the court to render it enforceable to the maximum extent permitted under applicable law.

17. Certain Tax Matters. The parties hereto intend that the Executive Units qualify as "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43 and other related official guidance promulgated by the Internal Revenue Service. However, the Company makes no guarantee with respect to the tax treatment of the Executive Units hereunder, and Executive acknowledges that the Company makes no warranties as to any tax consequences regarding the Executive Units hereunder, and specifically agrees that the determination of any tax liability or other consequences associated with the issuance, holding, vesting or disposition of the Executive Units hereunder is Executive's sole and complete responsibility and that Executive shall pay all taxes, if any, assessed on the Executive Units or any payments in respect thereof under applicable law.

18. Definitions. For the purposes of this Agreement, the following terms have the meanings set forth below:

(a) "Crestview Group Investments" means the aggregate dollar amount of all loans made to, guaranties of debt of (to the extent the guaranty is called and drawn), and equity and working capital contributed to or invested in, directly or indirectly, the Company and its Subsidiaries by the Crestview Group.

(b) "Crestview Group Proceeds" means the aggregate cash consideration and Marketable Securities received by the Crestview Group in respect of the Crestview Group Investments (i) as of an Exit Event (including any prior Exit Event on a cumulative basis, but after taking into account any dilution resulting from outstanding incentive equity awards), or (ii) prior to an Exit Event, upon payment to the Crestview Group of any extraordinary cash dividend or significant distribution or the proceeds of any partial liquidation of the Company or any of its Subsidiaries (excluding, for the avoidance of doubt, any fees or expense reimbursements under any applicable management or professional services agreement); provided that Marketable Securities will not be taken into account as Crestview Group Proceeds until the Crestview Group has received cash proceeds in respect of at least seventy-five percent (75%) of its ownership of securities of the Company. For the avoidance of doubt, Crestview Group Proceeds will be determined on a net basis, after giving effect to any vesting that may result from a transaction giving rise to, or otherwise from or in connection with, the receipt of such Crestview Group Proceeds, which may require an iterative calculation.

(c) "Equity Multiple" means, as of the date of any Exit Event, a fraction (i) the numerator of which is equal to the Fair Market Value of all Crestview Group Proceeds as of such

date (taking into account any dilution resulting from outstanding incentive equity awards, if applicable) and (ii) the denominator of which is equal to the Crestview Group Investments.

(d) "Exit Event" means the occurrence of an Approved Sale or a Qualified Public Offering, or the Wind-Up Date. If the Exit Event is a Qualified Public Offering and the Performance Vesting Units do not become fully vested in connection therewith, then each subsequent sale of Company securities by the Crestview Group will also be considered an Exit Event.

(e) "Internal Rate of Return" means, as of any measurement date, the interest rate (compounded annually) which, when used as the discount rate to calculate the net present value as of the date thereof of the sum of (i) the aggregate value of all Crestview Group Proceeds, and (ii) the aggregate amount of all Crestview Group Investments, causes such net present value to equal zero. For purposes of the net present value calculation, (A) Crestview Group Proceeds will be positive numbers, (B) Crestview Group Investments will be negative numbers, and (C) the Crestview Group Proceeds and the Crestview Group Investments will be deemed to have been received or made on the first day of the month nearest to the actual date of such receipt or payment.

(f) "LLC Agreement" means that certain Amended and Restated Limited Liability Company Agreement, dated March 17, 2015, by and among the Company and the Members from time to time party thereto, as amended, supplemented or otherwise modified from time to time in accordance with its terms.

(g) "Marketable Securities" means securities (i) issued by an issuer with a market capitalization equal to or greater than $200,000,000, (ii) that are of a class of securities listed on a major national or international stock exchange, (iii) that constitute, in the aggregate, not more than twenty-five percent (25%) of the outstanding securities of such class, and (iv) that are or were issued to the holder thereof in a transaction registered under the Securities Act, or the resale of which by the holder thereof is registered under the Securities Act, and are otherwise freely tradable by the holder thereof without restriction under applicable laws.

(h) "Wind-Up Date" means the earlier of (i) the first date on which the Crestview Group no longer holds any equity securities of the Company and no longer holds any equity interest received in respect of any such equity securities held or previously held by the Crestview Group (other than Marketable Securities issued in exchange for the sale of equity securities of the Company), or (ii) a sale, transfer, conveyance or other disposition, in one or a series of related transactions, of all of the Company's assets to an individual or entity not affiliated with the Crestview Group.

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

**SIGNATURE PAGE TO INCENTIVE UNIT AGREEMENT**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of a deed on the date first written above.

**JR TECHNOLOGY HOLDINGS, LLC**

________________________________

By: Scot Lindemann

Its: CEO

**SIGNATURE PAGE TO INCENTIVE UNIT AGREEMENT**
***(continued)***

**EXECUTIVE**

Vince Jowell
Executive's Signature

Executive's Address

13466 LAUREN LANE
GRAND HAVEN, MI
49417

State of Residence: MICHIGAN
*(for purposes of the spousal consent set forth on* *Exhibit B* *attached hereto)*

______________________________
Witness' Signature

______________________________
Witness' Name

**EXHIBIT A**

**PROTECTIVE ELECTION TO INCLUDE MEMBERSHIP INTEREST IN GROSS INCOME PURSUANT TO SECTION 83(b) OF THE INTERNAL REVENUE CODE**

On May 21, 2015, the undersigned executed a management incentive unit agreement (the "Incentive Unit Agreement") pursuant to which equity interests (the "Management Incentive Units") in JR Technology Holdings, LLC (the "Company") were issued in connection with the provision of services by the undersigned to or for the benefit of the Company. Pursuant to the Incentive Unit Agreement and the Amended and Restated Limited Liability Company Agreement, dated March 17, 2015 (the "LLC Agreement"), the holder of the Management Incentive Units is entitled to an interest in Company capital exactly equal to the amount paid or to be paid therefor and an interest in Company profits, and so the Management Incentive Units qualify as "profits interests" within the meaning of Revenue Procedure 93-27 as of the date that the Management Incentive Units are issued. If the relationship under the Incentive Unit Agreement ceases, then under certain circumstances the amount that the holder of the Management Incentive Units will be entitled to receive as a result of a disposition of the Management Incentive Units may be less than the fair market value thereof. Hence, the Management Incentive Units are subject to a substantial risk of forfeiture.

Based on Section 83 of the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations promulgated thereunder, Treasury Regulation §1.721-1(b), Proposed Treasury Regulation §1.721-1(b)(1) and Revenue Procedures 93-27 and 2001-43, the undersigned believes that neither the undersigned's execution of the Incentive Unit Agreement nor the issuance of the Management Incentive Units pursuant thereto is subject to the provisions of Section 83 of the Code. In the event that execution of the Incentive Unit Agreement or issuance of the Management Incentive Units is so treated, however, the undersigned desires to have such execution or issuance taxed under the provisions of Section 83(b) of the Code at the time the undersigned executed the Incentive Unit Agreement and the Management Incentive Units were issued.

Therefore, pursuant to Section 83(b) of the Code and Treasury Regulation §1.83-2 promulgated thereunder, the undersigned hereby makes an election, with respect to the Management Incentive Units, to report as taxable income for the calendar year 2015 the excess (if any) of the value of the Management Incentive Units on May 21, 2015 over the purchase price thereof.

The following information is supplied in accordance with Treasury Regulation §1.83-2(e):

1. The name, address and social security number of the undersigned is as follows:

VINCE LOWELL
13466 LAUREN LANE,




Social Security No.: [redacted]

2. A description of the property with respect to which the election is being made: The Management Incentive Units, including any rights therein that the holder of such units acquired upon the execution of the Incentive Unit Agreement and the LLC Agreement.

3. The date on which the property was transferred: May 21, 2015. The taxable year for which the election is made: Calendar Year 2015.

4. The restrictions to which the property is subject: If the employment relationship between the undersigned and the Company and its subsidiaries ends, then under certain circumstances the amount that the holder of the Management Incentive Units will be entitled to receive as a result of a disposition of the Management Incentive Units may be less than the fair market value thereof.

5. The fair market value of the property with respect to which the election is being made, determined without regard to any lapse restrictions and in accordance with Revenue Procedure 93-27, on the date such property is transferred: zero ($0).

6. The amount paid for such property: zero ($0).

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

**SIGNATURE PAGE TO SECTION 83(b) ELECTION**

A copy of this election has been furnished to the Company and each other person to whom a copy is required to be furnished pursuant to Treasury Regulation 1.83-2(d).

Signature: Vince Lowell

Print Name: VINCE LOWELL

Dated: 5/19/15

**EXHIBIT B**

**SPOUSAL CONSENT**

The undersigned spouse of Executive hereby acknowledges that I have read the foregoing Management Incentive Unit Agreement executed by Executive as of the date hereof and that I understand its contents. I am aware that the foregoing Management Incentive Unit Agreement, together with the LLC Agreement, provides for the sale or repurchase of my spouse's Management Incentive Units under certain circumstances and/or imposes other restrictions on such securities (including, without limitation, restrictions on transfer). I agree that my spouse's interest in these securities is subject to these restrictions and any interest that I may have in such securities shall be irrevocably bound by these agreements and further, that my community property interest, if any, shall be similarly bound by this instrument.

Spouse's Signature:_________________________________

Print Name:_________________________________________

Dated:______________________________________________

Witness' Signature:_________________________________

Print Name:_________________________________________

Dated:______________________________________________

# EXHIBIT C

## JOINDER TO JR TECHNOLOGY HOLDINGS, LLC

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

THIS JOINDER (this "Joinder") to that certain Amended and Restated Limited Liability Company Agreement, dated as of March 17, 2015 by and among JR Technology Holdings, LLC, a Delaware limited liability company (the "Company") and the Members (the "Limited Liability Company Agreement"), is made and entered into as of May 21, 2015, by and between the Company and Vince Lowell ("Holder"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Limited Liability Company Agreement.

WHEREAS, Holder has acquired certain Management Incentive Units, and pursuant to Section 3.1(c)(i) of the Limited Liability Company Agreement, the Holder is required, as a holder of such Management Incentive Units, to become a party to the Limited Liability Company Agreement, and Holder agrees to do so in accordance with the terms hereof.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Joinder hereby agree as follows:

1. Agreement to be Bound. Holder hereby agrees that upon execution of this Joinder, it shall become a party to the Limited Liability Company Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Limited Liability Company Agreement as though an original party thereto and shall be deemed a Management Incentive Holder and Member for all purposes thereof.

2. Successors and Assigns. This Joinder shall bind and inure to the benefit of and be enforceable by the Company and its successors and permitted assigns and Holder and any subsequent holders of Management Incentive Units and the respective successors, heirs and permitted assigns of each of them, so long as they hold any Management Incentive Units.

3. Counterparts. This Joinder may be executed in any number of counterparts (including by facsimile or electronic copy), each of which shall be an original and all of which together shall constitute one and the same agreement.

4. Notices. For purposes of Section 12.11 of the Limited Liability Company Agreement, all notices, demands or other communications to the Holder shall be directed to the address set forth on the signature page hereto for such Holder.

5. Governing Law. This Joinder shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

6. Descriptive Headings. The descriptive headings of this Joinder are inserted for convenience only and do not constitute a part of this Joinder.

* * * * *

**IN WITNESS WHEREOF**, the parties hereto have executed this Joinder as of the date first above written.

**JR TECHNOLOGY HOLDINGS, LLC**

By: [signature]
Name: Bryan Jones
Title: CEO

[signature]
**VINCE LOWELL**

Address: 13466 Lauren Lane, Grand Haven, MI 49417
Facsimile Number: ______
Email: ______