UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| J.R. AUTOMATION TECHNOLOGIES, LLC, a Michigan limited liability company | Civ. Act. No. 1:25-cv-03419<br>Honorable Arun Subramanian |
|     Plaintiff, | |
| v. | |
| VINCE LOWELL; and BEN GARVELINK, | |
|     Defendants. | |

---

## <u>PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT</u>

## **ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................................................. ii

I.      Introduction.................................................................................................. 1

II.     Pertinent Allegations and Background........................................................... 3

III.    Law and Argument....................................................................................... 6

        A. Standard of Review.............................................................................. 6

        B. Defendants' Motion Should Be Denied ................................................6

              1. JRA Is an Express Third-Party Beneficiary of the MIUs ...................................7

              2. JRA, a Subsidiary and Affiliate of Holdings, Is a Presumptive Party to
                 the MIUs .................................................................................................11

              3. Defendants' Arguments Ignore Settled Third-Party Beneficiary
                 Principles, Rely on Inapposite Authority, and Would Lead to Absurd
                 Results .................................................................................................14

              4. The MIUs' Non-Competition Provision Is Reasonable and Enforceable ......... 20

              5. JRA's Breach of Contract Claim Is Clearly Sufficient Under Twombly
                 and Iqbal .................................................................................................24

IV.     Conclusion ...................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All Pro Maids, Inc. v. Layton*,
    No. Civ.A. 058–N, 2004 WL 1878784 (Del. Ch. Aug. 9, 2004)...................................... 22

*Arthur J. Gallagher Serv. Co. v. Egan*,
    514 F. App'x 839 (11th Cir. 2013)................................................................................. 12

*Ascenea, LLC v. Zisook*,
    No. 08-5339 (DRD), 2011 WL 1323017 (D.N.J. Apr. 5, 2011)..................................... 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................. 6, 24, 25

*ATAX N.Y., Inc. v. Canela #1*
    No. 21 Civ. 5916 (JPC), 2022 WL 3018151 (S.D.N.Y. July 29, 2022) ...................... 23, 26

*Bako Pathology LP v. Bakotic*
    288 A.3d 252 (Del. 2022) ............................................................................................... 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................... 6, 26

*BitGo Holdings, Inc. v. Galaxy Digit. Holdings, Ltd.*
    319 A.3d 310 (Del. 2024) .............................................................................................. 12

*Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*
    No. N17C-06-170 PRW CCLD, 2019 WL 1877400 (Del. Super. Ct. Apr. 26, 2019) ...... 18

*Churchville v. GACS Inc.*
    973 So.2d 1212 (Fla. Dist. Ct. App. 2008) ........................................................................ 13

*Citadel Holding Corp. v. Roven*
    603 A.2d 818, 824 (Del. 1992) ...................................................................................... 15

*Crispo v. Musk*
    304 A.3d 567 (Del. Ch. 2023)........................................................................... 7, 8, 10, 15

*Elite Cleaning Co. v. Capel*
    No. Civ.A. 690–N, 2006 WL 1565161 (Del. Ch. June 2, 2006)..................................... 23

*Ellington v. EMI Music, Inc.*
    21 N.E.3d 1000 (N.Y. 2014)..................................................................................... 12, 18

*Farmers Bank of State of Del. v. Howard*
    276 A.2d 744 (Del. Ch. 1971)................................................................. 7

*Faw, Casson & Co. v. Cranston*
    375 A.2d 463 (Del. Ch. 1977)................................................................ 24

*Gory Assoc. Indus., Inc. v. Griffin*
    397 So.2d 1054 (Fla. Dist. Ct. App. 1981) ........................................ 13

*Greenstar, LLC v. Heller*
    814 F. Supp. 2d 444, 450 (D. Del. 2011) ........................................... 24

*Hampton v. Turner*
    No. 8963–VCN, 2015 WL 1947067 (Del. Ch. Apr. 29, 2015) ........................ 16

*In re Scripsamerica, Inc.*
    634 B.R. 863 (Bankr. D. Del. 2021) .................................................. 19

*Jackson v. Carroll*
    643 F. Supp. 2d 602, 612 (D. Del. 2009) ........................................... 19

*Kawa v. United States*
    86 Fed. Cl. 575 (Fed. Cl. 2009) ......................................................... 8

*Lyons Ins. Agency, Inc. v. Wark*
    No. CV 2017-0348-SG, 2020 WL 429114 (Del. Ch. Jan. 28, 2020)............................. 21

*Mayor & City Council of Balt. v. Citigroup, Inc.*
    709 F.3d 129 (2d Cir. 2013) ............................................................. 6

*McCann Surveyors, Inc. v. Evans*
    611 A.2d 1 (Del. Ch. 1987)........................................................ 21, 22

*MetCap Sec. LLC v. Pearl Senior Care, Inc.*
    No. 2129-VCN, 2007 WL 1498989 (Del. Ch. May 16, 2007) ................................ 8, 10

*Origis USA LLC v. Great Am. Ins. Co.*
    -- A.3d --, 2025 WL 2055767 (Del. 2025) ...........................................11

*Osborn ex rel. Osborn v. Kemp*
    991 A.2d 1153 (Del. 2010).............................................................. 18

*Philips Elecs. N. Am. Corp. v. Hope*
    631 F. Supp. 2d 705 (M.D.N.C. 2009) ............................................... 13

*Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P.*
    243 F. Supp. 2d 145 (D. Del. 2003)................................................ 7, 8, 9

*Rsch. & Trading Corp. v. Pfhul*
    No. 12527, 1992 WL 345465 (Del. Ch. Nov. 18, 1992)............................................. 22, 23

*Siemens Med. Solutions Health Servs. Corp. v. Carmelengo*
    167 F. Supp. 2d 752 (E.D. Pa. 2001) ...........................................................................11, 13

*Sunder Energy, LLC v. Jackson*
    332 A.3d 472 (Del. 2024) ................................................................................................ 21

*Symbiont.io, Inc. v. Ipreo Holdings, LLC*
    No. 2019-0407, 2021 WL 3575709 (Del. Ch. Aug. 13, 2021)......................... 2, 16, 17, 18

*Synthes, Inc. v. Knapp*
    250 F. Supp. 3d 644 (E.D. Cal. 2017)............................................................................. 13

*Tristate Courier & Carriage, Inc. v. Berryman*
    No. C.A. 20574-NC, 2004 WL 835886 (Del. Ch. Apr. 15, 2004) .............................. 22, 23

*Trustees of Four Joint Bds. Health & Welfare Pension Funds v. Penn Plastics, Inc.*
    864 F. Supp. 342, 347 (S.D.N.Y. 1994)........................................................................... 10

*Universal Studios Inc v. Viacom Inc.*
    705 A.2d 579 (Del. Ch. 1997)......................................................................................... 19

*US Ecology, Inc. v. Allstate Power Vac, Inc.*
    No. 207-0437-AGB, 2018 WL 3025418 (Del. Ch. June 18, 2018)................................. 13

*UtiliSave, LLC v. Miele*
    No. 10729–VCP, 2015 WL 5458960 (Del. Ch. Sep. 17, 2015) .................................. 25, 26

*WaveDivision Holdings, LLC v. Millennium Digit. Media Sys., LLC*
    No. 2993-VCS, 2010 WL 3706624 (Del. Ch. Sept. 17, 2010) ........................................ 25

*Weichert Co. of Pa. v. Young*, No. 2223-VCL
    2007 WL 4372823 (Del. Ch. Dec. 7, 2007) ......................................................... 22, 23, 24

*Zambelli Fireworks Mfg. Co. v. Wood*
    592 F.3d 412 (3d Cir. 2010)....................................................................11, 13, 14, 15, 19

## <u>Other Authorities</u>

2 Williston on Contracts § 347 (3d ed.)..................................................................................... 7

Restatement (Second) of Contracts § 302................................................................................. 8

Restatement (Second) of Contracts § 311......................................................................... 8, 10, 15

**Rules**

Fed. R. Civ. P. 12(b)(6) ........................................................................................................... 6

Fed. R. Civ. P. 8(a)(2) ........................................................................................................... 25

## I.      __INTRODUCTION__

After Defendants Vince Lowell and Ben Garvelink resigned from Plaintiff J.R. Automation Technologies, LLC ("JRA"), Defendants blatantly violated their restrictive-covenant obligations to JRA.  As alleged in the operative Complaint, and as discovery will show, Defendants have commenced employment at a direct competitor of JRA and unfairly solicited JRA's employees and customers.  Defendants' unfair competition and improper use of JRA's confidential information has caused JRA to suffer immense damages, including lost profits and business opportunities, wasted investments into Defendants, increased operational and replacement costs, and impairment to customer goodwill and competitive standing in the marketplace.

To attempt to escape their clear contractual obligations to JRA, Defendants claim that JRA cannot enforce the restrictive covenants.  This unsupported contention fails for several reasons. *First*, JRA is an express, intended third-party beneficiary to the relevant contracts—Defendants' Management Incentive Unit Agreement ("MIUs")—with a vested right to enforce the restrictive covenants.  The MIUs explicitly designate JRA as a third-party beneficiary, and the parties' obvious contractual intent was for JRA to benefit from the restrictive covenants.  Because JRA relied on the MIUs' protections, JRA's rights in the MIUs irrevocably vested as a matter of black-letter law, and the signatories to the MIUs lost any right to divest JRA of those rights.  And the stock sale of JRA could not, and did not, deprive JRA of this vested right because JRA was the same company with the same employees and contractual rights post-sale.  Defendants simply ignore this fundamental third-party beneficiary law in arguing otherwise.

*Second*, JRA is also a presumptive party to the MIUs.  The plain, unambiguous language of the restrictive covenants extends to and directly protects the "Affiliates" and "Subsidiaries" of JR Technology Holdings, LLC ("Holdings"), JRA's then-parent.  JRA indisputably was both an Affiliate and a Subsidiary of Holdings at the time of contracting and many years beyond.  Contrary

1

to Defendants' suggestions, the MIUs were unaffected by the stock sale of JRA, so following that sale, JRA retained its enforcement rights under the restrictive covenants, meaning assignment of the MIUs was unnecessary.

*Third*, the only authority Defendants rely on to attempt to establish JRA's purported lack of enforcement rights does not support their position. *See generally Symbiont.io, Inc. v. Ipreo Holdings, LLC*, No. 2019-0407, 2021 WL 3575709 (Del. Ch. Aug. 13, 2021). Defendants' argument is based entirely on an inaccurate, superficial characterization of the issues in that case, as well as the court's analysis of those issues, which are not present here. While *Symbiont.io* involved a *later-acquired* affiliate *gaining* a contractual *obligation*, this case is about a *former* affiliate purportedly *losing* a contractual *right*. In other words, *Symbiont.io* did not involve the issue of whether a third-party beneficiary or party could be deprived of a right based on a stock sale. A determination that Holdings' former Affiliate, JRA, loses a contractual right upon the stock sale of JRA defies third-party beneficiary law and would lead to absurd results. Indeed, imagine a scenario in which a signatory to a settlement agreement agrees to release the counter-signatory's affiliates, yet upon the sale of an affiliate, the signatory tries to sue the former affiliate on a released claim simply because that entity is no longer an affiliate of the counter-signatory. That non-sensical claim would be doomed, just like Defendants' arguments: JRA did not lose the right to enforce the restrictive covenants simply by no longer being an Affiliate of Holdings, just like a hypothetical affiliate would not lose the right to be free from released claims upon ceasing to be an affiliate of the releasee. Defendants' superficial argument fails to consider both common sense and context.

*Finally*, with JRA's enforcement rights established, Defendants' secondary arguments also fail. The non-competition provision is reasonable and enforceable (and Defendants waived any

right to challenge it anyway), and JRA's breach of contract claim clearly survives federal-pleading standards.  Accordingly, the Court should deny Defendants' motion to dismiss.

## II.     PERTINENT ALLEGATIONS AND BACKGROUND

JRA is a global leader in manufacturing automation, where it designs, builds, tests, and installs custom automation solutions.  1st Am. Compl., ECF No. 47, ¶¶ 2, 18, 20.  JRA employs many high-level executives, who have "broad, if not unfettered, access to JRA's most confidential business information and [have] significant responsibility with respect to building JRA's business and interfacing with its customers."  *Id.* at ¶¶ 5, 21.  This confidential information includes "JRA's customer lists, business plans, financial data, strategic planning information, product specifications, bid and pricing information, and similar, highly confidential information about JRA, its customers, suppliers, and overall business strategies" (collectively, the "Confidential Information").  *Id.* at ¶ 5.  Because JRA solves complex issues for its customers with custom automation, the institutional, confidential knowledge that JRA employees gain through their employment—and must keep from JRA's competitors—is invaluable to JRA.  *See id.* at ¶¶ 2–5.

Defendants were among the high-level executives who had access to JRA's Confidential Information.  *Id.* at ¶ 11.  Defendant Vince Lowell was one of JRA's General Managers, *id.* at ¶ 12; and Defendant Ben Garvelink was also one of JRA's General Managers, *id.* at ¶ 13.  While employed at JRA, each Defendant had access to JRA's Confidential Information, and they were expected to use this information to run, manage, and grow JRA.  *Id.* at ¶¶ 5, 22; *see also id.* at ¶¶ 23–24 (detailing how each Defendant used JRA's Confidential Information).

To protect this Confidential Information, each Defendant entered into an MIU Agreement with Holdings, which contained several restrictive covenants benefiting Holdings' Affiliates and Subsidiaries.  *Id.* at ¶ 25; *see also* ECF Nos. 47-1–47-2, § 5.  Specifically, Defendants agreed not to use or disclose to the public JRA's Confidential Information; that they would not compete with

Holdings or its Subsidiaries for 12 months after their departure from JRA; and that they would not solicit any customers or employees away from Holdings or its Subsidiaries for 12 months after their departure from JRA.  ECF No. 47, ¶¶ 26–28 (quoting ECF Nos. 47-1–47-2, § 5(a)–(c)).  JRA was both a Subsidiary and Affiliate—as these terms are defined in Holdings' LLC Agreement and used in the MIUs—of Holdings at the time of contracting and several years beyond.[1]  *Id.* at ¶¶ 35–40; ECF No. 47-3, § 1.1.  The MIUs expressly grant Holdings' Affiliates, including JRA, the right to enforce the restrictive covenants as third-party beneficiaries.  ECF Nos. 47-1–47-2, § 5(f) ("[Holdings] Affiliates *will have* the right to enforce all of [Defendants'] obligations to that Affiliate under this Agreement . . . and *shall be* third-party beneficiaries hereunder." (emphasis added)).  In exchange for agreeing to these restrictive covenants, JRA highly compensated Defendants.  ECF No. 47, ¶¶ 5–6.

Once Defendants signed the MIUs, JRA entrusted each Defendant with its Confidential Information.  *Id.* at ¶ 42.  At that moment, JRA's right to enforce the restrictive covenants vested.  *Id.* at ¶ 43.  For one, JRA—an Affiliate and Subsidiary of Holdings at the time of contracting—gained a direct enforcement right under the express terms of the MIUs as a presumptive party.  *Id.* at ¶¶ 31, 33–40 (quoting ECF Nos. 47-1–49-2, § 5(b)–(c), (f) (providing that the restrictive covenants protect Holdings' "Subsidiaries" and giving Holdings' "Affiliates" the right to enforce the restrictive covenants)).  For another, the parties understood that the restrictive covenants were intended to benefit each of Holdings' operating entities, such as JRA.  *Id.* at ¶ 41.  Unlike Holdings, JRA actually conducts business, has customers, and has employees that can be subject to the restrictive covenants.  *See id.* at ¶ 44.  And Defendants had direct access to *JRA's* Confidential

---

[1] Tellingly, Defendants do not dispute this fact in any of their submissions.  Nor could they reasonably do so.

Information.  *Id.* at ¶ 5.  Because the parties understood the restrictive covenants to protect JRA and JRA relied on that intent, JRA gained at least a third-party beneficiary right to enforce these restrictive covenants in the event of any Defendant's breach.  *Id.* at ¶¶ 41–42.

In December 2019, Hitachi Industrial Holdings America, Inc. ("Hitachi") acquired a 100% equity interest in JR Technology Group, LLC—an intermediate entity between Holdings and JRA—and all its subsidiaries via a stock purchase deal, thereby acquiring JRA and all its contractual rights.  *Id.* at ¶ 45.  "Following the deal, as the operating entity, JRA's operations continued largely uninterrupted, including its employment, customer, and contractual relationships."  *Id.*

Years after the Hitachi transaction, each Defendant resigned from JRA.  *Id.* at ¶ 48.  Each Defendant "accepted an identical, or substantially similar, position with Huizenga, a direct JRA competitor."  *Id.* at ¶ 49.  In their new positions, Defendants are using JRA's Confidential Information, including information regarding prospective customers, causing some customers to conduct business with Huizenga rather than JRA.  *Id.* at ¶ 51.  And shortly after their departures, Defendants solicited about a dozen other JRA employees to resign and take substantially similar positions at Huizenga.  *Id.* at ¶ 50.  These actions are *direct* violations of the confidentiality, non-competition, and non-solicitation provisions of Defendants' MIUs.

Based on this conduct, JRA brought this breach of contract action against Defendants, as well as four other related suits against other former JRA executives who breached the restrictive covenants and now work at other competitors.  *See generally J.R. Automation Technologies, LLC v. Cruz*, No. 1:25-cv-03417 (S.D.N.Y.); *J.R. Automation Technologies, LLC v. McIllwain*, No. 1:25-cv-03418 (S.D.N.Y.); *J.R. Automation Technologies, LLC v. Lowell*, 1:25-cv-03419 (S.D.N.Y.); *J.R. Automation Technologies, LLC v. Sarchet*, No. 1:25-cv-04945 (S.D.N.Y.); *J.R.*

5

*Automation Technologies, LLC v. Holstege*, No. 1:25-cv-04946 (S.D.N.Y.).  Defendants now move to dismiss the operative Complaint.  *See* 1st Am. Compl., ECF No. 47; Mot. to Dismiss, ECF Nos. 48, 49.  Because JRA has clearly stated a claim for breach of contract, the Court should deny Defendants' motion.

### III.    LAW AND ARGUMENT

#### A.    STANDARD OF REVIEW.

When reviewing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss, courts must "accept all factual allegations as true and draw every reasonable inference from those facts in the plaintiff's favor."  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).  Although a sufficiently pleaded complaint must contain more than "naked assertions," it need not contain "detailed factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted).  The complaint need only state a plausible claim, not a probable one.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Accordingly, a well-pleaded complaint must survive a motion to dismiss, even if recovery seems "very remote and unlikely."  *Twombly*, 550 U.S. at 556 (citation omitted).

#### B.    DEFENDANTS' MOTION SHOULD BE DENIED.

Defendants principally contest JRA's right to enforce the restrictive covenants in the MIUs. But JRA has clearly alleged that it can enforce these provisions, either as an intended, express third-party beneficiary or as a presumptive party to the contracts.  And the sole authority Defendants rely on to support their lack-of-enforceability arguments is based on a totally different issue, with totally different facts, and a totally different analysis.  Defendants' reliance on a superficial characterization of this authority, without meaningfully considering whether its analysis

6

even applies here (it does not), falls far short.  Further, suggesting that Defendants know JRA has the authority to enforce the MIUs' restrictive covenants, Defendants grasp at straws by tepidly arguing that the non-competition provision is unreasonable and that JRA's Complaint is insufficient under *Twombly* and *Iqbal*'s federal pleading standards.  None of these arguments survive even cursory scrutiny.  JRA therefore respectfully requests that the Court deny Defendants' motion.

### 1.      JRA Is an Express Third-Party Beneficiary of the MIUs.

JRA has more than one avenue it can use to enforce the restrictive covenants in the MIUs. Most obviously, JRA has a vested, irrevocable right to enforce the MIUs as an intended third-party beneficiary.  Like express parties, intended third-party beneficiaries may enforce a contract.  *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022); *Farmers Bank of State of Del. v. Howard*, 276 A.2d 744, 745–46 (Del. Ch. 1971) ("A contract made for the benefit of a third party is enforceable in Delaware and the third party may sue to enforce a promise made for his benefit. . . ." (citing 2 Williston on Contracts § 347 (3d ed.))).[2]  "To qualify as a third-party beneficiary, the party seeking such status must establish that the contract was made for the benefit of that third party within the intent and contemplation of the contracting parties."  *Rottlund Homes of N.J., Inc. v. Saul, Ewing, Remick & Saul, L.L.P.*, 243 F. Supp. 2d 145, 153 (D. Del. 2003) (citation omitted) (applying Delaware law).

Intent—which is "key" to determining third-party beneficiary status—depends on "the terms of the contract and the surrounding circumstances."  *Id.*; *see also Crispo v. Musk*, 304 A.3d 567, 573 & n.31 (Del. Ch. 2023).  Put differently, courts look to both the plain language of the

---

[2] Defendants do not dispute that Delaware law governs disputes, such as this one, arising out of the MIUs.  *See* ECF Nos. 47-1–47-2, § 8; ECF No. 49, p. 3.

contract, *see Rottlund Homes*, 243 F. Supp. 2d at 153, and whether the third-party beneficiary reasonably believed, based on those terms, that it had a right to enforce the contract, *see Crispo*, 304 A.3d at 573; *see also Kawa v. United States*, 86 Fed. Cl. 575, 588 (Fed. Cl. 2009) ("One way to ascertain . . . intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." (citation omitted)); *see also* Restatement (Second) of Contracts § 302 cmt. c–d (Am. L. Inst. 1981).

Notably, once a third-party beneficiary's rights vest, the contracting parties cannot "modify or deprive the beneficiary of a vested right without the beneficiary's consent." *Crispo*, 304 A.3d at 574 & n.34; *see also* Restatement (Second) of Contracts § 311(3) (Am. L. Inst. 1981). Relevant here, these rights irrevocably vest once the third party has "acted in reliance upon" the contract. *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, No. 2129-VCN, 2007 WL 1498989, at *8 & n.62 (Del. Ch. May 16, 2007); *see also* Restatement (Second) of Contracts § 311(3) (noting that a third-party beneficiary's rights under a contract vest when he "materially changes his position in justifiable reliance on the promise"). Such reliance need only be "justifiable." Restatement (Second) of Contracts § 311 cmt. g; *see also id.* § 302(d).

Here, JRA is an express, intended third-party beneficiary of the restrictive covenants in the MIUs. ECF No. 47, ¶¶ 31–47. As evidenced by both the plain language of the MIUs and the conduct of JRA and the signatories, the parties clearly intended for Holdings' Affiliates and Subsidiaries, such as JRA, to benefit from the restrictive covenants. In turn, the parties clearly did *not* intend for Defendants to get the windfall of being unilaterally relieved, at any point, from the obligations of the restrictive covenants. The MIUs expressly prohibit Defendants from competing with or soliciting employees and customers from Holdings *and* "any of its Subsidiaries." *Id.* at ¶ 34 (quoting ECF Nos. 47-1–47-2, § 5(b)–(c)). The parties agreed that "these restraints are

8

necessary for the reasonable and proper protection of the Company *and its Affiliates* and their Confidential Information." *Id.* at ¶ 33 (quoting ECF Nos. 47-1–47-2, § 5(f) (emphasis added)). In fact, the MIUs explicitly provide that Holdings' "Affiliates *will* have the right to enforce all of [Defendants'] obligations to that Affiliate under [the MIUs] . . . and *shall be* third-party beneficiaries hereunder."[3] *Id.* at ¶ 32 (quoting ECF Nos. 47-1–47-2, § 5(f) (emphasis added)). The plain terms of the MIUs could not reflect the parties' intent more clearly: the contracting parties explicitly intended for JRA, an Affiliate and Subsidiary of Holdings, to have the right to enforce the restrictive covenants under the terms of the MIUs.

The "surrounding circumstances" alleged in the Complaint further confirm the parties' intent. *See Rottlund Homes*, 243 F. Supp. 2d at 153. Holdings was just that: a holding company. ECF No. 47, ¶ 44. It had "no employees, customers, or business operations." *Id.* The restrictive covenants would be meaningless if they protected only Holdings (and not its Affiliates and Subsidiaries) because no employees would be subject to them, and there would be no confidential information for Holdings to protect. Conversely, Holdings' operating companies, such as JRA, were the entities with the protectable Confidential Information. *Id.* at ¶¶ 5, 44. And through their direct employment at *JRA*, Defendants had unfettered access to *JRA's* Confidential Information, which would have unfairly benefitted *JRA*'s competitors if they obtained it. Defendants thus understood—as alleged and discovery will show—that the restrictive covenants were intended to protect *JRA*. *Id.* at ¶¶ 41, 44. Therefore, JRA is an intended third-party beneficiary of the MIUs.

JRA then reasonably and justifiably relied on the restrictive covenants. For example, JRA "allow[ed] Defendants to access its Confidential Information, employ[ed] Defendants, invest[ed]

---

[3] Defendants ignore this language in the MIUs, choosing instead to focus on arguments about JRA's current status as an Affiliate or Subsidiary—an analysis that is irrelevant in light of JRA's undisputed status as a third-party beneficiary.

in Defendants' professional development, encourag[ed] Defendants to collaborate with [JRA's] other employees, [and] encourag[ed] Defendants to build relationships with [JRA's] customers." *Id.* at ¶ 42. JRA also highly compensated each Defendant, recognizing their commitment to JRA and its Confidential Information. *Id.* at ¶¶ 5, 44. Absent the MIUs' restrictive covenants, JRA never would have allowed Defendants to work at JRA, let alone access any Confidential Information. But JRA made these substantial investments in Defendants because it relied on the protections of the MIUs. *See id.* at ¶¶ 42–44; *see also* Restatement (Second) of Contracts § 311 cmt. g ("In the absence of some contrary indication, an intended beneficiary is justified in relying on the promise.").

Upon this reliance, JRA's third-party beneficiary right to enforce the restrictive covenants irrevocably vested. *See, e.g.*, *MetCap Sec.*, 2007 WL 1498989, at *8. The moment JRA's right vested, the contracting parties lost the ability to deprive JRA of its rights under the MIUs, absent JRA's consent. *See Crispo*, 304 A.3d at 574 & n.34; Restatement (Second) of Contracts § 311(3).

*Trustees of Four Joint Boards Health & Welfare Pension Funds v. Penn Plastics, Inc.* illustrates this principle. 864 F. Supp. 342, 347 (S.D.N.Y. 1994). There, Penn Plastics and a Union entered into a collective bargaining agreement that obligated Penn Plastics to make contributions to a pension fund, in amounts that would increase each year. *Id.* at 344. Thereafter, the Union and Penn Plastics purported to execute an amendment to the collective bargaining agreement that eliminated the scheduled increases in contribution rates. *Id.* When the Trustees of the fund sued, the court held that the signatories (Penn Plastics and the Union) could not deprive the third-party beneficiary (the fund) of its right to collect increased contribution rates absent the fund's consent. *Id.* at 347. The amendment, which attempted to deprive the fund of its vested right, was therefore ineffective. *Id.* at 347 n.6. Similarly, JRA has a vested right to enforce the restrictive covenants,

10

and subsequent conduct of the contracting parties cannot, without JRA's consent, divest it of that right. Of course, JRA never gave such consent. ECF No. 47, ¶ 57. JRA's enforcement rights thus remain to this day.

The stock sale did not deprive JRA of this vested right or affect that right in any other way. Even after JRA was sold as part of a stock sale, JRA was the same company with the same name, customers, employees, and contractual relationships. ECF No. 47, ¶ 45. "[A] change in stock ownership is merely a transfer of shareholder rights which does not, in and of itself, normally affect the existence of the corporate entity." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 423 (3d Cir. 2010); *Siemens Med. Solutions Health Servs. Corp. v. Carmelengo*, 167 F. Supp. 2d 752, 759 (E.D. Pa. 2001) (noting that stock sales "simply" cause "the name of the corporation [to] change[]"). Consequently, the stock sale, which did "not alter" JRA's corporate identity, did not alter JRA's vested third-party beneficiary right to enforce the MIUs. *See Zambelli*, 592 F.3d at 423. As an operating entity of Holdings, "JRA's operations continued largely uninterrupted" after the sale, due to the protections of the MIUs surviving the sale. ECF No. 47, ¶ 45. Thus, the stock sale is immaterial to JRA's third-party beneficiary enforcement rights.

Accordingly, JRA has sufficiently pleaded that it has a third-party beneficiary right to enforce the restrictive covenants.

### 2. JRA, a Subsidiary and Affiliate of Holdings, Is a Presumptive Party to the MIUs.

Additionally, JRA can enforce the MIUs as a presumptive party to the contracts. Delaware courts "enforce the plain meaning of clear and unambiguous language." *Origis USA LLC v. Great Am. Ins. Co.*, -- A.3d --, 2025 WL 2055767, at *11 (Del. 2025). Although "clear and unambiguous language is reasonably susceptible to only one interpretation," "[l]anguage from a contract need

11

not be perfectly clear for an interpretation of it to be deemed as the only reasonable one." *BitGo Holdings, Inc. v. Galaxy Digit. Holdings, Ltd.*, 319 A.3d 310, 322 (Del. 2024) (citations omitted).

As explained above, the plain language of the MIUs extends to and protects Holdings' Affiliates and Subsidiaries. ECF No. 47, ¶¶ 32–34. To reiterate, Holdings' Affiliates "have the right to enforce" the restrictive covenants; the parties entered into the restrictive covenants to protect Holdings "and its Affiliates"; and the non-competition and non-solicitation clauses extended to Holdings and "any of its Subsidiaries." *Id.* (quoting ECF Nos. 47-1–47-2, § 5(b)–(c), (f)). Because the "plain language" of the MIUs extends to JRA, an Affiliate and Subsidiary of Holdings at the time Defendants signed the MIUs, JRA is a "part[y] to the" MIUs. *See Arthur J. Gallagher Serv. Co. v. Egan*, 514 F. App'x 839, 842 (11th Cir. 2013) (per curiam).

On this point, *Arthur J. Gallagher* is instructive. There, the defendant-employee, Thomas Egan, entered into a non-competition agreement with Arthur J. Gallagher & Co., the parent company of Egan's former employer. *Id.* at 840. When Egan left the company and allegedly breached the non-competition covenants, his former employer (the non-signatory subsidiary) sued to enforce the covenants. *Id.* at 841. The district court granted, and the 11th Circuit affirmed, the plaintiff-subsidiary's motion for a preliminary injunction. *Id.* at 842. Without even considering any third-party beneficiary argument, the court held that the covenants' plain language—which "extended to" Arthur J. Gallagher's subsidiaries—rendered the subsidiaries "parties to the agreement." *Id.* The same is true here: JRA was an express Affiliate and Subsidiary of Holdings at the time of contracting, so the MIUs' plain language extended directly to JRA. *See Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1004 (N.Y. 2014) (interpreting the term "affiliate" under a contract to include "those affiliates in existence at the time that the contract was executed"). Therefore, JRA is a "part[y] to the agreement[s]." *See Arthur J. Gallagher*, 514 F. App'x at 842;

12

*see also Gory Assoc. Indus., Inc. v. Griffin*, 397 So.2d 1054, 1055–56 (Fla. Dist. Ct. App. 1981); *Churchville v. GACS Inc.*, 973 So.2d 1212, 1215–16 (Fla. Dist. Ct. App. 2008).

Once again, the stock sale does not change this conclusion. "[I]t is a general principle of corporate law that all assets and liabilities are transferred in the sale of a company effected by a sale of stock." *US Ecology, Inc. v. Allstate Power Vac, Inc.*, No. 207-0437-AGB, 2018 WL 3025418, at \*6 (Del. Ch. June 18, 2018) (citation omitted). After the sale, "JRA's operations continued largely uninterrupted." ECF No. 47, ¶ 45. That makes sense, given that a stock sale "does not alter the corporate entity." *Zambelli*, 592 F.3d at 423. Therefore, the stock sale here actually *reinforces* JRA's right, as a party, to enforce the restrictive covenants based on JRA's retention of the MIUs. *See Ascenea, LLC v. Zisook*, No. 08-5339 (DRD), 2011 WL 1323017, at \*7 (D.N.J. Apr. 5, 2011) (noting that restrictive covenants automatically carry over as part of a stock sale).

Applying these fundamental principles, following a stock sale, restrictive covenants need not be assigned to a new entity to enforce them. *Zambelli*, 592 F.3d at 422; *Synthes, Inc. v. Knapp*, 250 F. Supp. 3d 644, 652–53 (E.D. Cal. 2017) (holding that, following a stock purchase, the acquiring entity could enforce the restrictive covenants a former employee had entered into with the acquired entity); *Carmelengo*, 167 F. Supp. 2d at 758–59 (holding that, following a stock sale, the acquiring entity could enforce restrictive covenants in employer agreements that the acquired company had made because the defendant-employee "should not be deemed to work for a new employer simply because the name of the corporation changed and the corporation's shares have changed hands"); *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 713 (M.D.N.C. 2009) ("[A] non-competition agreement is enforceable by an entity acquiring the agreement through a stock purchase."). Because JRA was the same company before and after the stock sale,

13

Defendants' assertion that "JRA [does not] allege that the MIU Agreements were ever assigned to JRA" is irrelevant, *see* ECF No. 49, p. 4; there was no need for such an assignment.

Together, the MIUs' unambiguous language that grants JRA enforcement rights and the "basic tenant of corporate law" that stock sales do not affect the existence and rights of the corporate entity establish that JRA can enforce the MIUs' restrictive covenants as a party to the agreements, even after the stock sale. *See Zambelli*, 592 F.3d at 423. JRA was an Affiliate and Subsidiary of Holdings at the time of contracting, and the plain language of the MIUs gave Holdings' Affiliates and Subsidiaries the right to enforce the restrictive covenants. And because JRA's corporate identity and contractual rights remained exactly the same after the stock sale, JRA can still enforce the restrictive covenants post-sale. *See id.*

For these reasons, JRA has also sufficiently pleaded that it can enforce the restrictive covenants as a party to the MIUs.

**3.**      **Defendants' Arguments Ignore Settled Third-Party Beneficiary Principles, Rely on Inapposite Authority, and Would Lead to Absurd Results.**

Arguing that JRA lacks enforcement rights, Defendants focus on the unremarkable fact that JRA was, but no longer is, an Affiliate or Subsidiary of Holdings. Defendants effectively argue that JRA's right to enforce the restrictive covenants against them simply vanished upon JRA's change in Affiliate/Subsidiary status. But Defendants' arguments fail under basic third-party beneficiary law and principles of contracting. Nor does their own authority support their case. The Court should reject Defendants' superficial, inapposite arguments accordingly.

First, Defendants entirely ignore the black-letter third-party beneficiary principles articulated above. They claim, without any support whatsoever, that JRA's third-party beneficiary rights "terminated" after the stock sale. ECF No. 49, p. 9. Not so. Under Delaware law, once JRA's rights under the MIUs vested upon JRA's reasonable reliance on the restrictive covenants,

14

the contracting parties lost the power to modify or deprive JRA of its right to enforce the restrictive covenants. *See, e.g.*, Restatement (Second) of Contracts § 311(3)[4]; *Crispo*, 304 A.3d at 574. Because JRA's rights under the MIUs had already vested, the stock sale changed nothing—JRA retained the right to enforce the restrictive covenants, and it could not be divested of that right without its consent. *See Zambelli*, 592 F.3d at 423. Defendants' cursory argument simply ignores this settled black-letter law.

Second, Defendants' argument that the right to enforce the non-competition and non-solicitation clauses (but not the confidentiality provision) expired one year after the stock sale fails for the same reason. Again, the stock sale could not affect JRA's *vested* right to enforce the restrictive covenants. Moreover, this argument—unsupported by any authority—is illogical and constitutes an absurd interpretation of the MIUs. *See Citadel Holding Corp. v. Roven*, 603 A.2d 818, 824 (Del. 1992) (interpreting the disputed contractual provision to "advance[] the intent of the parties without producing an absurd result"). Following the stock sale, Defendants continued to work for JRA and continued to have access to JRA's Confidential Information. To say that the non-competition and non-solicitation clauses' one-year clocks started ticking upon the sale would belie the parties' contractual intent, which was to protect JRA—the operating company that directly employed Defendants and provided them access to Confidential Information—and produce an absurd result. *See Hampton v. Turner*, No. 8963–VCN, 2015 WL 1947067, at *3 (Del. Ch. Apr.

---

[4] Notably, Defendants rely on subsections (1) and (2) of § 311 of the Restatement (Second) of Contracts, which concern the contracting parties' power to modify or discharge a third-party beneficiary's rights under a contract. ECF No. 49, p. 9. But Defendants fail to mention that those subsections apply only *before* the third-party beneficiary's rights have vested. *See* Restatement (Second) of Contracts § 311(3), cmt. g; *Crispo*, 304 A.3d at 573–74. The Restatement and Delaware law are clear that once the intended third-party beneficiary's rights have vested, the contracting parties no longer have the power to divest the beneficiary of its vested rights. Restatement (Second) of Contracts § 311(3); *Crispo*, 304 A.3d at 574. In light of this black-letter law, Defendants' argument fails.

29, 2015) (explaining that Delaware courts "avoid[] interpretations that produce absurd results to which the parties would have agreed"). The Court should reject this non-sensical interpretation.

Third, Defendants argue that JRA's former status as an Affiliate/Subsidiary of Holdings is irrelevant because JRA was not an Affiliate/Subsidiary at the time of the breach. ECF No. 49, p. 5, 7–8. But this argument rests entirely on a superficial summary of one unpublished Delaware Court of Chancery opinion that involved an entirely different issue with an entirely unrelated analysis. *See generally Symbiont.io*, 2021 WL 3575709. As an initial matter, *Symbiont.io* was not even a third-party beneficiary case and thus cannot rescue Defendants' arguments. In *Symbiont.io*, two companies, Symbiont and Ipreo, formed a joint venture involving syndicated loans. *Id.* at *1. The joint venture agreement's non-competition provision prevented Symbiont, Ipreo, and their affiliates from competing with the joint venture. *Id.* at *2, *7. The parties created the joint venture to compete with ClearPar, a product owned by a company called Markit, which had monopolized the joint venture's targeted market. *Id.* at *1. But shortly after the joint venture's formation, Markit acquired Ipreo. *Id.* at *1–2. That acquisition appeared to cause Ipreo to violate the non-competition provision in the joint venture agreement because Ipreo's new affiliate, Markit, continued to operate ClearPar in direct competition of the joint venture. *Id.* at *2. Symbiont sued Ipreo for breach of contract. *Id.*

At issue was whether Markit qualified as an affiliate of Ipreo under the joint venture agreement and was therefore subject to the obligations of the non-competition provision after the acquisition. *Id.* at *26. To answer that question, the court examined the definition of "affiliate" in that agreement. *Id.* That definition determined affiliate status based on the alleged affiliate's relationship with the company; it was silent as to any temporal restrictions. *Id.* at *28. Because Markit was not an affiliate of Ipreo at the time of contracting but later became an affiliate and was

16

so at the time of the breach, the temporal aspect of defining "affiliate" was key. *See id.* at \*26. Symbiont argued that affiliate status should be determined at the time of the breach, and Ipreo argued that it should be determined at the time of contracting. *Id.*

The court agreed with Symbiont and held that, under the language of that particular joint venture agreement, affiliate status was determined "when contractual compliance is measured." *Id.* at \*29. It noted that the definition of affiliate did not include a temporal restriction, like "as of the effective date," that would limit the time period for determining affiliate status. *Id.* And it relied on other provisions in the contract and the intent of the parties, which suggested that the companies' affiliates subject to the restrictive covenants were not defined by a frozen time period but rather by the companies' evolving relationships. *See id.* at \*26–30. Given the context of that case—a contracting party seeking to enforce an obligation under the contract against a new affiliate that the parties intended the obligation to cover—that conclusion makes sense. Otherwise, Symbiont and Ipreo could have gained new affiliates immediately after they executed the joint venture agreement, which would have been free to compete with the joint venture, thereby rendering the non-competition obligation meaningless. Rejecting such an absurd result, the court enforced the parties' intended interpretation of "affiliate" and held that Ipreo breached the joint venture agreement's non-competition provision when its new affiliate competed with the joint venture. *Id.* at \*27.

Importantly, *Symbiont.io* presents the inverse scenario to the instant matter. There, the issue was whether a new, post-contracting affiliate could gain a contractual *obligation* by becoming an affiliate. Here, the issue is whether an affiliate at the time of contracting can lose a contractual *right* by no longer being an affiliate of the contracting party. When the parties executed the MIUs, JRA was an Affiliate and Subsidiary of Holdings. It thus had a specific right under the MIUs to

17

enforce their restrictive covenants.  ECF No. 47, ¶¶ 32–40.  JRA did not lose this right simply because it was no longer an Affiliate and Subsidiary of Holdings after the sale.  The plain language of the MIUs—and the incorporated definitions of "Affiliate" and "Subsidiary" from Holdings' LLC Agreement—confirm that JRA unambiguously gained the right to enforce the restrictive covenants "at the time" it fell within the definition of an Affiliate or Subsidiary.  *See* ECF No. 47-3, § 1.1; ECF Nos. 47-1–47-2, § 5(b)–(c), (f).  Although JRA's *status* as an Affiliate/Subsidiary of Holdings might have changed, its enforcement *rights* under the plain language of the contract remain.  *See Ellington*, 21 N.E.3d at 1004.  And as a third-party beneficiary and presumptive party, nothing divested JRA of that enforcement right.[5]  *Symbiont.io* simply does not apply here.[6]

Despite this, Defendants claim that *Symbiont.io* somehow requires this Court to define affiliate status at the time of the breach, not at the time of contracting.  But here, in a totally different context, that interpretation would lead to an absurd result.  *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 & n.21 (Del. 2010) (an "absurd result" is "one that no reasonable person would have accepted when entering the contract"); *see also Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, No. N17C-06-170 PRW CCLD, 2019 WL 1877400, at *11 (Del. Super. Ct. Apr. 26, 2019) (Delaware courts interpret unambiguous contracts in a way that will avoid absurd interpretations).  It would make no sense for JRA to have an unambiguous right to enforce the restrictive covenants against its employees but then lose that right, as to these same employees, simply because the company of which JRA is an affiliate "transferr[ed] [its] shareholder rights" to

---

[5] Notably, the MIUs provide that, upon a sale of Holdings, the incentive units immediately vest; the MIUs *do not* provide that the restrictive covenants are no longer enforceable.  ECF Nos. 47-1–47-2, § 2(c).

[6] Further evidencing *Symbiont.io*'s inapplicability, *Symbiont.io* did not analyze third-party beneficiary rights.  *See generally Symbiont.io*, 2021 WL 3575709.  That is likely because, unlike here where a contractual *right* is at issue, a contractual *obligation* was at issue in *Symibont.io*.

a different entity. *See Zambelli*, 592 F.3d at 423; *see also Jackson v. Carroll*, 643 F. Supp. 2d 602, 612 (D. Del. 2009) ("The primary consideration in interpreting a [contract] is to give effect to the intent of the parties at the time they contracted, and the court will attempt to determine intent from the overall language of the [contract]." (citation omitted)).  In other words, concluding that JRA at one time had a right to enforce the restrictive covenants, but then lost that right the second it was no longer owned by Holdings—despite continuing to trust Defendants with Confidential Information that was subject to the restrictive covenants—would be an absurd interpretation of the MIUs, would render the entire restrictive-covenant provisions meaningless, and would simply ignore the parties' contractual intent.  It would further be absurd that Defendants, who worked for JRA at the time they signed the MIUs and therefore knew the entity to which they owed their obligations, would somehow enjoy the windfall of being relieved of their obligations just because the ownership of JRA changed.  The absurdity therefore lies in Defendants' cursory reliance on *Symbiont.io* and their argument that JRA lost its enforcement rights based on a definitional change.[7]

To demonstrate this absurdity, consider an analogous scenario involving a release of claims in a settlement agreement.  It is common practice in settlement agreements to release not only the signatory to the agreement, but also its affiliates, subsidiaries, officers, and directors from any future related claims.  *See In re Scripsamerica, Inc.*, 634 B.R. 863, 878–79 (Bankr. D. Del. 2021) (example of common release language).  Of course, if a settling party sells one of its affiliates

---

[7] *Symbiont.io*'s primary authority, *Universal Studios Inc v. Viacom Inc.*, 705 A.2d 579 (Del. Ch. 1997), is distinguishable for the same reasons.  Like *Symbiont.io*, *Viacom* involved a post-contracting affiliate *gaining* a contractual *obligation* rather than a former affiliate *losing* a contractual *right*. *Id.* at 590–91.  The court's interpretation of affiliate in that context (involving a stranger to the contract) is therefore inapposite to the present matter (involving a part of the contractual family).

19

(meaning the affiliate becomes a former affiliate of the settling party) or an officer or director subsequently seeks employment elsewhere (meaning the employee becomes a former officer or director of the settling party), that affiliate, officer, or director does not lose the release rights gained as part of the settlement. Put differently, a signatory to a release of the counter-party's directors and officers cannot sue a former officer of the counter-signatory on a released claim just because that former officer is no longer employed at the counter-signatory. Once an entity or person gains a contractual right based on their status at the time of contracting, the entity/person retains that right unless the underlying agreement states otherwise or the parties agree to extinguish that right. In this example, losing status as an employee or affiliate after gaining the contractual benefit of a release is not an act that would extinguish that benefit. To conclude otherwise would be absurd and contrary to basic principles of contract law. Accordingly, Defendants—who agreed to the restrictive covenants in the MIUs for the benefit of their employer, JRA—are not free of their obligations to JRA any more than a party—who released claims against an affiliate or officer/director—is free to sue that affiliate or officer/director on released claims once the entity's status as an affiliate ends or the officer/director seeks employment elsewhere. Similarly, JRA retained the right to enforce its restrictive covenants despite no longer being an affiliate of Holdings.

Accordingly, the Court should reject all of Defendants' meritless arguments regarding JRA's enforceability rights and hold that JRA has sufficiently pleaded that it has a right to enforce the restrictive covenants.

### 4.    The MIUs' Non-Competition Provision Is Reasonable and Enforceable.

Next, Defendants' challenge to the enforceability of the MIUs' non-competition provision on substantive grounds also fails. Because "Delaware is a pro-contractarian state," its courts are

20

"of the view that value may inhere in [non-competition agreements] and will enforce covenants not to compete to the extent they are reasonably tied to the interests of the employer. . . ." *Lyons Ins. Agency, Inc. v. Wark*, No. CV 2017-0348-SG, 2020 WL 429114, at *1, *4 (Del. Ch. Jan. 28, 2020). Non-compete clauses are thus enforceable under Delaware law as long as they "(i) [are] reasonable in geographic scope and temporal duration, (ii) advance legitimate economic interests of the party seeking enforcement, and (iii) survive a balancing of the equities." *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 485 (Del. 2024). Relevant here, "where valuable trade secret or other proprietary information has been learned by the defendant and, therefore, his competition with plaintiff's business may be particularly effective and unfair, the contractual provision not to compete is more likely to be specifically enforced." *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 4 (Del. Ch. 1987).

Defendants challenge the reasonableness, and thus the enforceability, of the non-competition provision to which they agreed. This argument fails from the start—in each Defendant's MIU, they specifically waived the right to challenge the reasonableness of the restrictive covenants. ECF Nos. 47-1–47-2, § 5(f) ("[Defendants] will not challenge the reasonableness or enforceability of any of the covenants set forth in [this agreement]."). They further agreed that:

> these restraints are necessary for the reasonable and proper protection of the Company and its Affiliates and their Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent [Defendants] from obtaining other suitable employment during the period in which [Defendants are] bound by the restraints.

*Id.* Based on this provision alone, JRA has pleaded that the MIUs' non-competition clause is reasonable. ECF No. 47, ¶ 33 (citing ECF Nos. 47-1–47-2, § 5(f)).

21

Even looking beyond Defendants' waiver, the facts outlined in the operative complaint establish the non-compete's reasonableness.  First, its duration of "only" one year "is plainly reasonable."  *Rsch. & Trading Corp. v. Pfhul*, No. 12527, 1992 WL 345465, at *11 (Del. Ch. Nov. 18, 1992); *see also* ECF Nos. 47-1–47-2, § 5(b).  Given that Delaware "consistently" holds as reasonable non-competition provisions with a two-year duration, *Weichert Co. of Pa. v. Young*, No. 2223-VCL, 2007 WL 4372823, at *3 (Del. Ch. Dec. 7, 2007), the one-year duration here is certainly reasonable, *see, e.g.*, *All Pro Maids, Inc. v. Layton*, No. Civ.A. 058–N, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004) (one-year duration conceded as reasonable); *cf. McCann Surveyors*, 611 A.2d at 4 (finding a three-year restrictive covenant to be reasonable).

Similarly, the non-compete's geographical scope is limited to locations in which Holdings and its Subsidiaries conduct business.  ECF Nos. 47-1–47-2, § 5(b).  "The geographic scope of a restrictive covenant is acceptable to the extent it is necessary to protect a party's legitimate interests."  *Weichert*, 2007 WL 4372823, at *3.  Therefore, "the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect."  *Id.*  For that reason, Delaware courts consistently uphold non-competition provisions extending to anywhere the company "conducts or has conducted business," *Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *11 (Del. Ch. Apr. 15, 2004), and even those that "extend[] throughout the nation," *Pfhul*, 1992 WL 345465, at *12 ("[I]t is not unreasonable to restrict defendants from dealing with [the company's] customers wherever located.").

The MIUs' non-competition provision fits squarely within these requirements.  JRA is a global leader in manufacturing automation solutions, and it has "designed, built, tested, and installed custom automation solutions for leading companies" in the industry.  ECF No. 47, ¶ 2.

22

Defendants had unfettered access to JRA's Confidential Information regarding these custom automation solutions as well as JRA's clients. *Id.* at ¶ 5. To ensure that competitors did not unfairly benefit from this information without enduring its development and associated costs, it was essential for JRA to keep this complex information out of competitors' hands through restrictive covenants. *See id.* at ¶¶ 2–5. It was therefore reasonable for JRA to restrict Defendants from using this Confidential Information to compete with JRA anywhere JRA conducts business or its customers are located. *See Tristate Courier*, 2004 WL 835886, at \*11; *Pfhul*, 1992 WL 345465, at \*12. And in any event, the specific locations in which Defendants are restricted from competing are, at this point, questions of fact that will be resolved in discovery. *See ATAX N.Y., Inc. v. Canela #1*, No. 21 Civ. 5916 (JPC), 2022 WL 3018151, at \*6 (S.D.N.Y. July 29, 2022) ("Defendants' argument that the non-competition agreements are unenforceable because they are unreasonable . . . presents questions of fact.").

Next, the MIUs' non-competition provision advances JRA's legitimate economic interests. Delaware recognizes the "protection of employer goodwill," the "protection of employer confidential information from misuse," *Pfhul*, 1992 WL 345465, at \*12, and a company's "relationship with its employees" as legitimate economic interests that non-competes can protect. *Weichert*, 2007 WL 4372823, at \*4. The non-competition provision here aims to do just that: protect JRA's Confidential Information, such as customer information; maintain goodwill; and retain JRA's highly skilled and compensated employees in which it invested significant resources. *See* ECF No. 47, ¶¶ 5, 21–25; *see also Elite Cleaning Co. v. Capel*, No. Civ.A. 690–N, 2006 WL 1565161, at \*8 (Del. Ch. June 2, 2006) (suggesting that training employees with a "high level of skill" is a legitimate economic interest); *Weichert*, 2007 WL 4372823, at \*3 (similar). Indeed, as discovery will show, JRA's protection of these legitimate interests proved to be justified, given that

Defendants violated their non-compete clauses and used JRA's Confidential Information to solicit customers and employees away from JRA anyway.

Finally, the balance of the equities between the minimal restraint on trade and the protection of JRA's established commercial interests leans heavily in JRA's favor.  The importance of "protect[ing] the enjoyment of an establishment in trade or profession," which is "built up by . . . honest application to every day duty and the faithful performance of . . . tasks," cannot be understated.  *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 468 (Del. Ch. 1977).  JRA has already been harmed by Defendants' breaches of the non-competition provision, and this Court should prevent further harm.  Moreover, each Defendant voluntarily entered into the non-compete provision, so "[f]ailing to enforce the covenant[] would deprive [JRA] of the benefits of its bargain."  *Weichert*, 2007 WL 4372823, at *5.  Lastly, the non-competition clause does not prevent Defendants from earning a living, as they are highly skilled corporate executives who are free to work in any industry other than automation-solutions-related businesses.  *See id.*  And Defendants were highly compensated during their time at JRA for agreeing to the restrictive covenants anyway. The equities therefore weigh toward enforcement.

Accordingly, JRA has clearly alleged facts showing that the MIUs' non-competition provision is reasonable and enforceable.

### 5. JRA's Breach of Contract Claim Is Clearly Sufficient Under *Twombly* and *Iqbal*.

Defendants make a final passing appeal to *Twombly* and *Iqbal*.  At this stage, JRA need only allege enough facts for the Court "to draw the reasonable inference that the defendant[s] [are] liable for" breach of contract.  *Iqbal*, 556 U.S. at 678.  A claim for breach of contract requires JRA to allege facts supporting an inference of Defendants' breaches of a contractual obligation that caused damage to JRA.  *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011) (citing

*WaveDivision Holdings, LLC v. Millennium Digit. Media Sys., LLC*, No. 2993-VCS, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010)).

JRA's operative Complaint is more than sufficient under *Twombly* and *Iqbal*'s notice-pleading standards.  First, JRA alleged that Defendants had contractual obligations, arising out of the restrictive covenants in the MIUs, not to (1) disclose or use JRA's Confidential Information, (2) compete with JRA, or (3) solicit employees or customers from JRA.  ECF No. 47, ¶¶ 1, 6, 25, 26, 27, 28, 33, 34, 58.  Second, JRA pleaded that Defendants breached those provisions by resigning from JRA, beginning employment at a direct competitor, soliciting at least a dozen of former JRA employees to join the competitor, and using JRA's Confidential Information to solicit JRA's customers.  *Id.* at ¶¶ 7, 8, 17, 29, 30, 48, 49, 50, 51, 52, 59.  Finally, JRA alleged that Defendants' breaches caused damages to JRA, including lost profits, foregone business opportunities, increased operational and replacement costs, and ongoing impairment to its competitive standing in the marketplace.  *Id.* at ¶¶ 9, 53, 60.  From these allegations, the Court can easily infer that Defendants breached the restrictive covenants, entitling JRA to relief.  *See UtiliSave, LLC v. Miele*, No. 10729–VCP, 2015 WL 5458960, at *8, *10 (Del. Ch. Sep. 17, 2015) (inferring from the alleged facts that the plaintiff pleaded a breach of the relevant contract's confidentiality provision); *see also Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Ignoring these detailed allegations and the inferences that flow from them, Defendants urge the Court to view the Complaint with a hyper-technical lens and complain that JRA's factual allegations lack the specificity they would prefer.  But that is not what *Twombly* and *Iqbal* require.  Contrary to Defendants' contentions, JRA's lack of pleading "any particular employee who was improperly solicited," the specific number of solicited employees, or exactly how Defendants used JRA's Confidential Information, ECF No. 49, p. 17, does not render the Complaint insufficient

25

under Federal Rule of Civil Procedure 8(a) or *Twombly* and *Iqbal*.[8]  *See UtiliSave*, 2015 WL 5458960, at *9 (noting all the "fact-intensive question[s]" that were "ill-suited for determination at the pre-discovery stage" but on which the court could make an inference from in determining that the claim for breach of the contract's confidentiality provision could survive a motion to dismiss); *ATAX N.Y.*, 2022 WL 3018151, at *5–6 (rejecting the defendants' arguments that the breach of contract claim was not pleaded with "specificity" regarding certain customer lists and confidential information because "these arguments present[] questions of fact that may not be properly resolved on a motion to dismiss").  Defendants would improperly require JRA to plead "detailed factual allegations."  *See Twombly*, 550 U.S. at 555.  In any event, discovery will shed light on the specific information that Defendants seek (information that Defendants already know).

The Court should therefore reject Defendants' meritless argument and hold that JRA has sufficiently pleaded a claim for breach of contract.

## IV.    CONCLUSION

For these reasons, JRA respectfully requests that the Court deny Defendants' motion to dismiss and allow the parties to resolve the many questions of fact in discovery.

---

[8] Indeed, as the Court has already acknowledged, Defendants know which customers they solicited and when.  Similarly, they know how they used and disclosed JRA's Confidential Information.  The nature of JRA's claims is no mystery.

Respectfully submitted,

VARNUM LLP
Attorneys for Plaintiff

Date: December 19, 2025

By: /s/ *Ronald G. DeWaard*

Ronald G. DeWaard (MI P44117, admitted *pro hac vice*)
Timothy P. Monsma (MI P72245, admitted *pro hac vice*)
Hannah A. Cone (MI P87285, admitted *pro hac vice*)

Address, Telephone, and Email:
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
rgdewaard@varnumlaw.com
tpmonsma@varnumlaw.com
hacone@varnumlaw.com

and

RIKER DANZIG LLP

Tod S. Chasin, Esq. (TC-0122)
489 Fifth Avenue, 33rd Floor
New York, NY 10017-6111
(212) 302-6574
tchasin@riker.com

27

## LOCAL CIVIL RULE 7.1(C) CERTIFICATION

Pursuant to Local Rule 7.1(c), I hereby certify that the foregoing response, inclusive of footnotes, contains 8,428 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, and this certification.

/s/ *Ronald G. DeWaard*
Ronald G. DeWaard

28258002.1